In re Frank J. **MORETTINI** and Grace R. Morettini, Debtors.

**UNITED STATES NATIONAL BANK, Plaintiff,**

v.

**Frank J. MORETTINI and Grace R. Morettini, Defendants.**

**Bankruptcy No. 94–05345–8P7. Adv. No. 94–542.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 2, 1995.

Robert M. Coplen, Tampa, FL, for U.S. Nat. Bank, plaintiff.

Jay D. Passer, Tampa, FL, for Frank J. Morettini, defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case, and the matter under consideration is the dischargeability vel non of the debt admittedly due and owing to United States National Bank (Bank) by Frank J. Morettini (Debtor) and his wife, Grace R. Morettini in the amount of $5,000. The Bank orally dismissed Grace R. Morettini from this adversary proceeding. This left for consideration the claim of nondischargeability against Frank J. Morettini. It is the Bank's contention that the obligation owed by the Debtor should be excepted from the overall protective provisions of the general bankruptcy discharge because the Debtor obtained credit when he had no intent to repay the same or knew that he lacked the ability to repay the obligation. Thus, according to the Bank, this debt is nondischargeable by virtue of § 523(a)(2)(A) of the Bankruptcy Code. In addition, the Bank also seeks the award of reasonable fees and costs based on *TranSouth Financial Corp. of Florida v. Johnson*, 931 F.2d 1505 (11th Cir.1991). The facts established at the final evidentiary hearing relevant to the matter under consideration are as follows:

At the time relevant, the Debtor was employed as a manager of both CBS Liquors, Inc. and NBC Liquors, Inc., owners and operators of two cocktail lounges. In 1993 the gross total which he earned was $15,896 in wages from this employment, although the Debtor testified that he did not receive regular paychecks from either CBS or NBC because he was a 50% owner of CBS and 100% owner of NBC. In addition to employment income, the Debtor received $500 per month in social security, $1,500 per month in rental income, and $1,150 per month from a mort-

gage receivable. The Debtor's wife also received social security benefits, rental income, and payments from a mortgage receivable. Their total combined monthly income according to the Schedule I was $7,424.67 per month. It should be noted at this point that the debtor also engaged in a check cashing service at both CBS and NBC, in which he cashed local paychecks from customers for a fee. It is not clear what amount of income was received from this activity, however, this practice is of particular importance to this case because the debtor financed the activity through the use of credit cards.

The Debtor's Schedule J lists the couple's monthly expenses on Schedule I at $18,822. Nearly half of these expenses are "business expenses," related to rental and business property. At this point, it is abundantly clear that the Debtor had a serious cash flow deficiency before even considering any credit card debt.

In December of 1993, the Debtor and his wife received an invitation to apply for a Visa Gold card issued by the Bank. He returned the application, and in February of 1994 received a joint Visa Gold card with a $5,000 credit limit. The Debtor immediately obtained a cash advanced by using the Visa card and exhausted its $5,000 limit on February 15. This cash advance was used by the Debtor to cash the payroll checks at his check cashing service for the employees of a nearby trucking company. The first minimum payment of $96.00 was due on April 8, 1994, and the Debtor made a payment in the amount of $200 on April 11. The Debtor also made another timely payment of $200 on May 4. No further charges or payments were made on this account. In addition to the credit card issued by the Bank, the Debtor and his wife had 32 other credit cards. In May of 1994, the balances carried on these cards amounted to $168,422.79. The corresponding minimum payment on these cards is $2,017. In May of 1994 the debtors sought the advice of an attorney and discontinued all credit card payments although they did not file their Petition for Relief under Chapter 7 of the Bankruptcy Code until June 2, 1994.

Based on these facts, it is the contention of the Bank that the balance owed by this debt-

or should be excepted from the overall provision of the general bankruptcy discharge based on § 523(a)(2)(A) of the Bankruptcy Code which provides in pertinent part as follows:

§ 523. Exceptions to Discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The burden of establishing a claim of nondischargeability is on the party who seeks such a determination. The burden of proof is no longer the clear and convincing standard, but merely the preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To establish a viable claim under § 523(a)(2)(A) for abuse of the privilege granted to a credit card holder, there must be competent proof that either the card holder used the credit card knowing that he had no intention to ever repay the debt, or knowing that he will not be capable to meet the obligations incurred through the use of the card. *In re Stokes*, 155 B.R. 785 (Bankr.M.D.Fla.1993).

The classic example of the first proposition is when the debtor consults an attorney for the purpose of filing bankruptcy and then makes charges on the credit card before filing bankruptcy. In the second scenario, the debtor's income is either nonexistent or insufficient to meet his other fixed monthly obligations and he has no realistic basis to anticipate a substantial increase in his income in the near future.

The Bank contends that it has met the burden of proving nondischargeability. First, the Bank points out that the Debtor admitted at trial that he was "robbing Peter to pay Paul" in that he was taking cash advances from all of his credit cards to meet the payments on these same cards, and thus was not able to meet his monthly financial

obligations at the time he took the cash advance from the Bank. Next, the Bank contends that the Debtor's average monthly non-business income, as reflected on either his 1993 tax return or Schedule I (excluding "business income"), is barely equal to his minimum credit card payments, and not even close to meeting his substantial living expenses. Finally, the Bank argues that the debtor's monthly income, including business income, falls short of his monthly living expenses without even considering credit card payments.

In his defense, the Debtor contends that he intended to repay the Bank with income from the sources listed on Schedule I. However, various unexpected events occurred which hindered his ability to repay. First, the Debtor had a decline in health. It should be noted that the Debtor is 75 years old. Second, the Debtor had a judgement entered against him in March of 1994 concerning a promissory note in the amount of $140,-126.72. Finally, the Debtor had · a large amount of NSF checks returned in connection with his check cashing business. As noted earlier, the Debtor engaged in cashing local payroll checks for customers of his liquor stores. Apparently, employees of a local trucking company routinely used the Debtor's services to cash their checks. According to the Debtor's answers to interrogatories, he received $98,000 in returned checks from this one source in May of 1994. The debtor argues that he used his credit cards to finance this check cashing business, and that the $98,000 in NSF checks would have been available to pay down the credit cards.

Although the Debtor certainly experienced numerous financial setbacks over a short period of time, the defenses asserted do not bear close analysis. Even without the rash of misfortune, a realistic assessment of the debtor's entire financial picture should have left him with a realization that he could not live up to the new credit card obligation from the Bank.

In a best case scenario, one might assume that the debtor would have applied the entire $98,000 in NSF checks, of collected, to his credit card balances. However, this would have only reduced the outstanding balances

to just over $70,000. Recall that the Debtor already had substantial negative cash flow without any credit card payments. Additionally, the assumption that the debtor would have paid down the cards is optimistic in light of the fact that he had carried a balance of at least $150,000 on these cards for the six months before filing under Chapter 7. Surely it did not take six months for the NSF checks to come back.

Probably the most relevant reason for finding that the debt is nondischargeable is contained in the Debtor's own testimony at trial. The debtor admitted that he was unable to meet his monthly financial obligations without the use of credit card cash advances at the time he obtained the $5,000 cash advance from the Bank. Furthermore, in the Debtor's own words he was "robbing Peter to pay Paul" with all 33 of his active credit cards. This court has no choice but to find that the Debtor, at the time of the cash advance from the Bank, knew that he would be unable to pay the obligation from regular income or a realistic anticipation of increased income.

Based on the foregoing, this Court is satisfied that the record warrants the conclusion that the debtor obtained monies and property through the use of the credit card by fraud and, therefore, the outstanding liability to the Bank shall be excepted from the general bankruptcy discharge.

A separate final judgement will be entered in accordance with the foregoing.

DONE AND ORDERED.